## MITCHELL vs. COOK and others.

Where a party brings a suit, as assignee of a mortgage, to foreclose the same, and fails in such suit in consequence of a defect in his title as assignee, the judgment of dismissal is no bar to a second action of foreclosure, brought by him after he has perfected his title by taking the requisite assignments.

The defendants executed a mortgage for $1400 to C., an individual banker, doing business under the name of the White Plains Bank. C. transferred the mortgage to the comptroller, to secure the redemption of the circulating notes of the bank. After such transfer was made, the defendants, with notice thereof, paid $1000, upon the mortgage, to the cashier of the bank. The plaintiff advanced $1400 to C. on an agreement that C. should procure from the comptroller a reassignment of the mortgage, for the plaintiff's benefit. C. paid that sum to the comptroller, and took a transfer of the mortgage, to himself, and delivered the security to the plaintiff, but without executing any formal assignment to him. In an action brought by the plaintiff, as assignee of the mortgage, to foreclose the same, the court of appeals decided that the assignment from the comptroller to C. was void, for want of authority in the comptroller to make the same, and that the plaintiff therefore had no title as assignee. The plaintiff having subsequently procured assignments of the mortgage, from C. and from the bank, brought this action to foreclose the same mortgage.

*Held*, 1. That the judgment of the court of appeals, in the former suit, was not a bar to the present action, on the ground of the question being *res adjudicata*.

2. That after the assignment of the mortgage, to the comptroller, the cashier of the bank had no right to receive a payment thereon; and that the plaintiff, being a *bona fide* assignee without notice, was not bound thereby.

3. That after the mortgage had been reassigned, by the comptroller, to C., the latter, and the then owner of the bank, had a right to assign and deliver the mortgage to the plaintiff, who had furnished the money to pay it, upon the faith of an agreement that he should become the owner.

THIS was an appeal from a judgment rendered at a special term. The action was brought for the foreclosure of a mortgage, and the judgment was in favor of the plaintiff. The following opinion was given by the judge who decided the cause at the special term:

S. B. STRONG, J. "This is an action to foreclose a mortgage given by the defendants, Cook and wife, to Elisha Crawford, and eventually assigned by him, and also by the White

Plains Bank, of which he had been president, to the plaintiff. The mortgage was dated on the 4th of September, 1844, and given to secure the payment of fourteen hundred dollars in seven years from its date, with interest at the rate of six per cent, payable semi-annually, according to a bond from Cook to Crawford of the same date. Crawford was, or is alleged to have been at the time, an individual banker, transacting business in the name or under the designation of "The White Plains Bank." Crawford testified on his last examination that the bank was instituted by him as an individual banker, under the general act to authorize the business of banking. (*Laws of* 1838, *ch.* 260, *p.* 245.) This is confirmed by the entries in the books kept in the office of the superintendent of the state bank department. The ledger opening an account with the bank, is headed in the following words : " Dr. White Plains Bank stocks, individual bank owned by Elisha Crawford of White Plains. Cr." There is also an affidavit on file in that office, made by Crawford on the 25th of July, 1849, stating that the bank was an individual bank, and that no person was interested with him, directly or indirectly, in the securities deposited with the comptroller. The loan to Cook was negotiated by one Richard Cadmus, who was at the time cashier, and who now asserts that he was the owner of the bank. This allegation that he was the owner is, to some extent, confirmed by the testimony of George Crawford and William H. Seely, from which it would seem that Cadmus, G. Crawford and Seely, had originally owned each one third of the bank, and that Crawford and Seely had transferred their interest to Cadmus. Seely, however, testified that such ownership consisted simply in, and did not extend beyond, the profits and plates. If they were the absolute owners, they were associated bankers, and they should have been described as such in the books of the bank department. But there is no evidence that any entry to that effect was made in the books. It would not be right to infer, except from clear evidence, that all of these parties had perpetrated a fraud upon

Mitchell *v.* Cook.

the state, for the purpose of obtaining facilities as an individual banker, to which they would not have been entitled as an association. Cadmus, when asked whether he owned the mortgages which were in the hands of and deposited with the comptroller, did not answer the question directly, but said, " I considered them to be under my control at any moment." There is no formal conveyance by Cadmus to any one, of the bank, or of any of the securities belonging to it, previous to July, 1846, when he became, as he states, a bankrupt. He then made an assignment of his property for the benefit of his creditors, in terms sufficiently broad to have covered his interest in the bank, if he had any. But although one of his assignees was examined as a witness in behalf of the defendants, it does not appear that the assignees ever claimed any interest in the bank, or any of its securities, or that they interfered in any way in its management. Besides, when Cook, on a subsequent day, made a tender of what he alleged to be due on the mortgage, he made such tender to Elisha Crawford, and not to Cadmus or his assignees.

There is no evidence that Cook, at the time, consulted with Cadmus; but it may, I think, be reasonably inferred that he did, as they had previously transacted much of the business together, and appear from the evident leaning shown in the testimony of Cadmus to be on friendly terms. The plain inference from all the reliable evidence is, that although when the loan to Cook was made, Cadmus had an interest in the affairs of the bank, yet it did not extend to its capital or the securities taken in its behalf and assigned to the state comptroller. The bond and mortgage given by Cook were obtained for the purpose of depositing them in the comptroller's office, and securing the amount in circulating notes intended for the bank. Examinations as to the value of the property, for the satisfaction of the comptroller, were made with so much publicity that Cook must have been aware of the object in making the loan. On the 5th of September, 1844, the mortgagee assigned the bond and mortgage to the comptroller, " to se-

cure the redemption of the circulating notes of the White Plains Bank." On the 20th of the same month Cook, who had in the meantime received the amount for which his securities had been given, in the circulating notes of the bank, signed an admission that he was indebted to Elisha Crawford in the sum of $1400, secured by the said bond and mortgage, and that he had received notice that such bond and mortgage had been assigned by E. Crawford to the comptroller of the state; subsequently Crawford (and when I speak of a person having that name, without any other designation, I mean the mortgagee) signed a paper dated on the 21st of January, 1844, (but mistaken in the year, as that must have been in 1845,) authorizing Cadmus to collect the interest on several bonds and mortgages, and among others the bond and mortgage from Cook.

Cadmus swears that he also had written authority from Crawford to collect and receive the principal; but in this he is directly contradicted by Crawford; and as one paper only is produced, and that simply authorizes the collection of the interest, and no satisfactory reason is given for the non-production of the supposed documents, if they ever existed, and especially as an alleged authority to receive the principal due or to become due on securities assigned to the comptroller, would be wholly nugatory, and no reason is shown why there should be any expectation that the principal moneys secured by Cook's mortgage would be paid before they became payable by the terms of the securities, (in 1851,) the inference is strong that no authority was given by Crawford to Cadmus to receive the principal moneys loaned to Cook.

On the first of January, 1846, Cook paid to Cadmus and took his receipt for $1000 of the principal and all the interest due on the entire principal moneys secured by the said bond and mortgage. It has been said already that no authority has been shown, nor can any be inferred from the proof, from Crawford to Cadmus, to receive such principal. His employment as cashier of the bank did not confer such authority.

Mitchell *v.* Cook.

Besides, if he received the money as a reduction to that extent of the principal, it was a fraud upon the state; or it would have been, if he could have effectuated that purpose. He knew that the comptroller could not receive payment of a part of the principal; nor would it seem that he intended to pay it to that officer, as he made no attempt to do so; but, as he confessed, he mingled the money with his own funds; as to Cook, he knew that his bond and mortgage had been assigned to the comptroller to secure the payment of the circulating notes of the bank; and as those papers were not produced by Cadmus at the time, he had strong reason to suppose, if he did not actually know, that they were still held by the comptroller for the purpose for which they had been assigned to him. If, under these circumstances, he intended that his payment should operate as a present reduction of the principal, he was a participator in a fraud.

It is a characteristic of fraud that it cannot avail the perpetrator, and if the usual effect could be fortified, it would be in this instance, by the consideration that the act was manifestly against public policy. The payment could not operate as an absolute reduction of the principal. If the state had been under the necessity of selling the securities, the sale would have conferred a title to the entire principal; a reconveyance to the assignor would have the same effect, unless he had particpated in the fraud. In this case, the assignor had neither received nor sanctioned the receipt of the principal. It is clear that Crawford was not consulted about the payment, and that he knew nothing about it until long after it had been made. Cadmus swears that he thinks that he communicated it to Crawford before he took a reassignment from the comptroller; but Crawford swears positively that he had heard nothing about it until after he had transferred the securities to the plaintiff; and in this he is supported by what took place when it was mentioned to him by his brother, and subsequently on the same day when Cook and his counsel, Mr. C. P. Smith, called to make the

tender to which I have alluded. The witnesses do not entirely agree as to what occurred at the last mentioned interview. Mr. Smith says, that Crawford said he knew or had heard of the payment: he did not recollect that Crawford remarked, "I have just heard of it," although he may have said so. But George Crawford, and Rust, (a witness introduced by the defendants,) both testified that Crawford said that he had just heard of it from his brother. The testimony of Cadmus, that he thought, but did not know, that he had made a previous communication of the payment to Crawford, is outweighed by the positive denial of the latter, and the circumstances sustaining such denial narrated by the other witnesses. Shortly previous to the 18th of July, 1846, the plaintiff delivered to Crawford circulating notes of the White Plains Bank, amounting to fourteen hundred dollars, on an agreement between them that Crawford should pay them to the comptroller, and take from him a reassignment of Cook's bond and mortgage, for the benefit of the plaintiff. On the day last particularized, Crawford delivered the same notes to the comptroller, and received from him a reassignment of the bond and mortgage, bearing date on the same day. Within a few days afterwards Crawford delivered those securities to the plaintiff, but did not then execute any formal assignment of them. The plaintiff thereupon instituted a suit against Cook and wife, to foreclose the mortgage. They defended the suit, and the action was heard before Mr. Justice McCoun at a special term. The evidence before him was much the same as that which has been adduced in this case; except that there is now evidence from the bank department that Crawford was an individual banker, which was not adduced before; and there have been since some additional acts confirmatory of the plaintiff's title. Judge McCoun rendered a judgment in favor of the plaintiff, directing a foreclosure of the mortgage, for the entire principal and the interest thereon, from the time when the plaintiff acquired a title to or interest in the securities. The judgment was unanimously affirmed at a

Mitchell *v.* Cook.

general term, by the same learned judge, and Judges Barculo and Morse. Their judgment was reversed by the court of appeals, solely on the grounds that the comptroller could not convey the bond and mortgage to any other than the person who had assigned it to him, either directly or indirectly, and there had been no transfer to the plaintiff after the reassignment to the plaintiff. The court of appeals could not have decided, and of course did not decide, that Crawford could not subsequently assign the securities to the plaintiff for a consideration primarily advanced by him. The judgment of this court, at special term and at general term, remains unaffected, except as to the points mentioned in the decision of the court of appeals, to which I have alluded. It forms a respectable, if not a controlling, authority in favor of the conclusion which I have thus far indicated, and which must have been substantially adopted by Judges McCoun, Barculo and Morse.

After the judgment of the court of appeals had been rendered, and in the month of April, 1853, Crawford executed an assignment of the bond and mortgage in question, to the plaintiff. Crawford had previously, on the 16th of December, 1849, conveyed the bank to one Emory B. Pottle of Naples, in the county of Ontario. Pottle, on the 2d of March, 1851, transferred the bank to Seth C. Hart of the same place, and the White Plains Bank, by Hart as its president, on the 6th of July, 1853, assigned all its interest in the bond and mortgage from Cook to the plaintiff. On the 22d of July, 1846, Cook tendered four hundred dollars, and the interest upon that, to Crawford, in full satisfaction of the bond and mortgage, which Crawford refused to receive. In my narration of the facts, I have so far considered the questions of law, that it is not necessary for me to do much more than state my conclusions.

The judgment of the court of appeals cannot operate as an estoppel to the plaintiff in this suit, as he has since perfected his right, so as to avoid the objections which then operated against him. He has since received an assignment from the

mortgagee, and also from the bank. Neither the bank nor the mortgagee oppose his claim. It is clear that the plaintiff has now the sole title to the mortgage, if any thing remains due upon it.

The main question is, whether the mortgage is still an incumbrance upon the land; and if so, to what extent? If the payment of $1000 to Cadmus was, at the time, or subsequently became, effective as a reduction of the debt, and there was a valid tender of the residue, then the land is entirely relieved from the lien, and the plaintiff must fail in this action, although he would still have a claim for such residue against Cook, on the bond.

Did, then, the payment of $1000 to Cadmus operate, at the time or afterwards, as a reduction of the principal secured by the bond and mortgage? As I have already mentioned, it could not reduce such principal while the securities were in the comptroller's office. Neither could it have such effect at any time, if Cadmus neither had any title to the securities nor any legitimate authority to receive such principal or any part of it. If I am right in inferring that Cadmus had neither such title or authority, then the payment was inoperative, except possibly to create a personal claim against him. But if, as the counsel for the defendants contended on the trial, Cadmus owned the bank, and the security was taken nominally for Crawford, but actually for him, and the money had been paid to and accepted by Cadmus on a promise or understanding that it should be credited on the bond and mortgage, when he should again become entitled to and have them, could Cook now claim a credit for the amount, and a proportionate reduction of the principal? Neither Cook nor Cadmus, nor the bank who owned it, nor Crawford as a trustee for any one, could claim these securities from the comptroller without the actual payment of the principal to him. The money received from Cook by Cadmus was never paid to that officer, nor was any payment made to him by or on behalf of Cook or Cadmus or the bank. The money which

went into the comptroller's office belonged wholly to the plaintiff. Neither Cook, Cadmus, the bank, nor Crawford, had any interest in it.

The payment was not, in fact, made for either of them. Crawford paid the money, as he alone could do that and receive a reassignment of the bond and mortgage.

It may be as the court of appeals decided, that on receiving such reassignment, he alone had, technically, a right to foreclose the mortgage. But surely neither the power nor duty of the comptroller could interfere or prevent the completion of a previous arrangement between Crawford and the plaintiff, or impair the rights or equities of the plaintiff under such arrangement. Can it be, that if a mortgagee, while his mortgage is in the possession of the comptroller, under the act relative to the free banks, agrees with a third person that if he will furnish the requisite funds, the mortgage shall be procured with such funds, and the security shall be transferred to him who advances the money, and the money is accordingly advanced and paid to the comptroller, and a retransfer had, the mortgagee cannot effectually assign the securities to the lender; or, that if he should then refuse to do so, the lender cannot coerce such transfer in a court of equity? It is so palpable that, under such circumstances, the assignment could be legally made, or, if necessary, coerced, that the contrary could never have been supposed, but for a misapprehension of the judgment of the court of appeals in the suit of *Mitchell* v. *Cook.* In this case there was primarily such an agreement, and the parties have endeavored to consummate it, and have done all that is necessary for that purpose, so far as it relates to them.

As Crawford did not pay his own money, he acted in a fiduciary capacity in taking the reassignment. For whom did he thus act? Not for the bank, if that was owned at the time by any other person, for the money paid by him was not furnished by said bank ; nor for Cook, as his money had not been received by Crawford, and of course was not applied by

him for any purpose ; nor for Cadmus, who had received such money; but, most assuredly, for the plaintiff, who had actually furnished the identical means.

If the controlling question in this case had been, which of the parties has the greater equity, it seems to me that the decision must have been in favor of the plaintiff. It is true that Cook has actually paid his money with an intent that it should be credited to him on his bond and mortgage. But he knew that those papers had been transferred to, and as he had every reason to believe, if he did not actually know, were then held by, the comptroller as security for the payment of the circulating notes of the bank to the same amount. He must have known—for every one is presumed to know the law—that the payment was unauthorized at the time, and that it could not avail him unless the bank or the payee should return the notes or pay the amount to the comptroller. He must therefore have trusted mainly to the responsibility of Cadmus, to whom he paid the money. It would seem from some of the testimony that he did so. Cadmus failed, and the money was never paid to the state officer. On the other hand, the plaintiff advanced the entire amount, and his funds were the sole consideration of the transfer. Knowing the law, as he did know it, not only presumptively but actually, he was aware that no part of the principal could be legally paid to another, while the bond and mortgage were held by the comptroller. He had a right to presume, and no doubt did suppose, that no unlawful attempt had been made to pay a part of the principal, and that the whole of it was still due. He was an innocent and bona fide purchaser of securities which, as they read, and as he had a right to suppose they were, were still valid for the entire amount.

If the payment by Cook had entitled him to a reduction of the principal, the tender of the balance would have been ineffectual ; because, first, it was made to one who had no right to receive the money ; and secondly, the time of payment of the principal had not arrived. It is very clear that

Mitchell v. Cook.

a tender of money before it is payable is invalid. It was contended by the counsel for the defendant, however, that this objection was waived, as it was not mentioned at the time. It is true that an objection is considered as waived when not explicitly stated, when it could have been obviated by the person making the tender, if he had been apprised of it ; but the principle extends no further. In this case there was of course no power to remove or avoid the objection, if it had been mentioned.

Upon the whole, it seems to me that the entire principal was due at the time of the assignment to the plaintiff, and that such assignment is valid.

There must be the usual judgment of foreclosure for the entire principal, and the interest upon it from the date of the reassignment by the comptroller."

The defendants appealed from the judgment. The appeal was argued by

*J. M. Van Cott*, for the appellants.

*S. E. Lyon*, for the plaintiff.

*By the Court*, BROWN, J. The judgment of the court of appeals, in the suit originally instituted in the late court of chancery, between Minott Mitchell, complainant, and Miles Cook and Rhoda his wife, defendants,(a) is not a bar to this action. It is not an adjudication between the same parties for the same cause of action. The complainant failed upon his title to the subject in controversy, and not upon the merits, as against the defendants. The bill in that suit was filed by the same plaintiff, against the same defendants, to foreclose the same indenture of mortgage as in the present suit. The plaintiff also, in that action as in this, prosecuted as the assignee of the mortgage security, but the decree of this court was reversed upon the sole ground that Minott Mitchell was

(a) Reported in 3 *Selden*, 538.

not the assignee, and could not maintain his suit in that
character.   He had furnished the circulating notes of the
White Plains Bank, upon an agreement with Elisha Crawford,
the mortgagee, that they were to be delivered to the comp-
troller of the state and the mortgage reassigned for his bene-
fit.   With these notes the reassignment was consummated,
and the bond and mortgage delivered to Minott Mitchell as
his own property.   As the comptroller, however, held them
under a special statute, for a special purpose, he could do no
more than follow the express injunctions of the act and re-
assign to the person from whom he received them.   The facts
were not sufficient, in the opinion of the court of appeals, to
constitute Minott Mitchell the owner of the bond and mort-
gage, in law or equity.   This is all.   The decree was reversed
and the bill dismissed, because, without an assignment from
Crawford, Minott Mitchell had no standing in court.   Now
when he reappears, with the bond and mortgage and the deed
or deeds of assignment in his hands perfect and complete, it
cannot be said that the question which he proposes to litigate
is *res adjudicata.*

The judge at the special term found as a fact, that Elisha
Crawford, the mortgagee, was an individual banker transact-
ing business under the name and designation of the White
Plains Bank.   This is a material fact in the case ; for if
Richard Cadmus was the owner of the White Plains Bank,
and the mortgage in question was part of its assets, the case
would assume quite a different aspect.   I do not see, however,
that the court at special term could have reached any other
conclusion.   The documentary evidence derived from the
bank department, the positive testimony of Elisha Crawford,
the omission of Cadmus and his assignees to make any claim
as owner or proprietor, without referring particularly to the
other proof, could hardly leave a doubt of the fact found by
the judge.   It follows, as a result, that Crawford, and those
who held the bank from him, had an undisputed right to as-
sign and deliver the mortgage to Minott Mitchell.   He had

Mitchell *v.* Cook.

furnished the circulating notes upon the faith of the agree-
ment that he was to become the owner of the mortgage.
The agreement was so far executed that the notes were ap-
plied to the uses contemplated, and the bond and mortgage
obtained and delivered over to him. And had he made the
bank and Elisha Crawford parties to his bill in chancery, and
framed it with a view to his equitable title as assignee, I can
hardly doubt but that his claim to relief would have been
affirmed.

The validity of the alleged payment of $1000, made by
Miles Cook on account of the mortgage, on the 1st January,
1846, and for which he holds the receipt of Richard Cadmus,
the cashier, depends upon the authority of Cadmus to receive
the money. The mortgage is dated on the 4th of September,
1844, and is made to secure the payment of $1400, with the
interest, seven years from the date. At the time the money was
paid, the mortgage had been assigned to, and was then in the
hands of, the comptroller. Of this transfer Cook had full
notice, as appears by his written admission of the date of
September 10th, 1844, which is amongst the exhibits. It
was no part of the cashier's business to receive the principal
moneys secured upon mortgages assigned to the comptroller
to assure the redemption of the circulating notes of the bank.
Whenever the notes were returned and the security reassigned,
it became the property of Crawford, the mortgagee. And as
cashier, even then I do not see how Cadmus could have
legally accepted the money and discharged the mortgage,
without special authority for that purpose. Crawford, as
president of the bank, had power from the comptroller, given
in pursuance of the 5th and 10th sections of the "act to au-
thorize the business of banking," to receive the interest on the
bonds and mortgages held for the bank. So Cadmus, by a
like power from Crawford, the president, dated January the
21st, 1844, had authority to receive the interest. Cook could
hardly have been deluded with the idea that he was making
a valid payment upon the mortgage. He knew that neither

Cadmus, nor the bank of which he was cashier, possessed the bond and mortgage. He knew that the money was not due, and that the sum paid was only a part of the sum secured. When Minott Mitchell advanced the money in the circulating notes of the bank, under the agreement with Crawford that he should receive the bond and mortgage from the comptroller, neither of them had notice, or was aware, that the payment had been made. Surely they are not bound by it. The subsequent tender of the balance of $400, on account of the principal, could under no circumstances be available to discharge the lien of the mortgage, unless the $1000 received by Cadmus was a valid payment.

I do not think it worth while to pursue the subject further. It was carefully and thoroughly examined, in all its aspects, by the judge at the special term, and his conclusions are in my judgment entirely right.

The judgment should be affirmed.

[DUTCHESS GENERAL TERM, May 9, 1859. *Brown, Davies* and *Clerke,* Justices.]